# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD)(SN) |

This document relates to:

*Horace Morris, et al. v. Islamic Republic of Iran*, No. 1:18-cv-05321 (GBD)(SN)
*Laurence Schlissel, et al. v. Islamic Republic of Iran*, No. 1:18-cv-05331 (GBD)(SN)
*Audrey Ades, et al. v. Islamic Republic of Iran*, No. 1:18-cv-07306 (GBD)(SN)
*Lloyd A. Abel Sr., et al. v. Islamic Republic of Iran*, No. 1:18-cv-11837 (GBD)(SN)
*Alexander Jimenez, et al. v. Islamic Republic of Iran*, No. 1:18-cv-11875 (GBD)(SN)
*Cheryl Rivelli, et al. v. Islamic Republic of Iran*, No. 1:18-cv-11878 (GBD)(SN)
*Marinella Hemenway, et al. v. Islamic Republic of Iran*, No. 1:18-cv-12277 (GBD)(SN)
*Matthew Rowenhorst, et al. v. Islamic Republic of Iran*, No. 1:18-cv-12387 (GBD)(SN)
*BNY Mellon, et al. v. Islamic Republic of Iran*, No. 1:19-cv-11767 (GBD)(SN)
*August Bernaerts, et al. v. Islamic Republic of Iran*, No. 1:19-cv-11865 (GBD)(SN)
*Jeanmarie Hargrave, et al. v. Islamic Republic of Iran*, No. 1:20-cv-09387 (GBD)(SN)
*Paul Asaro, et al. v. Islamic Republic of Iran*, No. 1:20-cv-10460 (GBD)(SN)
*Nicole Amato, et al. v. Islamic Republic of Iran*, No. 1:21-cv-10239 (GBD)(SN)
*Susan M. King, et al. v. Islamic Republic of Iran*, No. 1:22-cv-05193 (GBD)(SN)
*Justin Strauss, et al. v. Islamic Republic of Iran*, No. 1:22-cv-10823 (GBD)(SN)
*Celestine Kone, et al. v. Islamic Republic of Iran*, No. 1:23-cv-05790 (GBD)(SN)
*Gladys Lopez, et al. v. Islamic Republic of Iran*, No. 1:23-cv-08305 (GBD)(SN)

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR JUDGMENTS BY DEFAULT FOR THE *LOPEZ* PLAINTIFFS AGAINST THE ISLAMIC REPUBLIC OF IRAN AS TO LIABILITY AND FOR PARTIAL FINAL JUDGMENTS FOR DAMAGES ON BEHALF OF THE PLAINTIFFS IDENTIFIED IN EXHIBIT A AND EXHIBIT B**

ANDERSON KILL P.C.
Jerry S. Goldman, Esq.
Bruce E. Strong, Esq.
Alexander Greene, Esq.
1251 Avenue of the Americas
New York, NY 10020
Tel:    (212) 278-1000
Fax:    (212) 278-1733
Email:  jgoldman@andersonkill.com
        bstrong@andersonkill.com
        agreene@andersonkill.com

*Attorneys for Plaintiffs*

Dated:  New York, New York
        November 12, 2024

## TABLE OF CONTENTS

**Page(s)**

I.     INTRODUCTION ........................................................................................................... 1

II.    PRELIMINARY STATEMENT ................................................................................... 4

    A.    Orders ................................................................................................................ 4

    B.    Related Cases .................................................................................................... 5

    C.    Jurisdiction ........................................................................................................ 7

        1.    This Court Has Subject Matter Jurisdiction Over Iran ............................... 8

        2.    This Court has Personal Jurisdiction over Iran ......................................... 10

    D.    The Clerk Properly Entered Default Against Iran. ......................................... 10

III.   JUDGMENT AGAINST IRAN AS TO LIABILITY FOR THE LOPEZ
      PLAINTIFFS SHOULD BE ENTERED ................................................................... 10

    A.    Legal Standard for FSIA Default Judgment as to Liability ............................. 10

    B.    Plaintiffs State a Cause of Action Under the Terrorism Exception
        of the FSIA ...................................................................................................... 13

    C.    There Is a Factual Basis for Establishing Liability ......................................... 14

        1.    United States' Recognition of Iran as a State Sponsor of
            Terrorism................................................................................................. 16

        2.    Iran's Training and Support of al Qaeda Operatives ................................ 17

        3.    Iran's Support for the September 11, 2001 Attacks.................................. 20

    D.    Plaintiffs Have Established Material Support and Causation........................... 22

        1.    Plaintiffs Have Established Material Support........................................... 22

        2.    Plaintiffs Have Proved Causation ............................................................ 24

    E.    The Basis for Judgment as to Liability Has Been Established.......................... 25

IV.    DAMAGES – GOVERNING LAW ........................................................................... 26

    A.    Background........................................................................................................ 26

    B.    Solatium Damages............................................................................................ 27

    C.    Estate Pain and Suffering Damages ................................................................. 30

    D.    Estate Economic Damages ............................................................................... 30

    E.    Punitive Damages ............................................................................................. 32

    F.    Prejudgment Interest......................................................................................... 33

V.     CONCLUSION............................................................................................................ 35

docs-100717636.1

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashton v. al Qaeda Islamic Army,*
    02-CV-6977 (GBD)(SN) ................................................................. *passim*

*Baker v. Socialist People's Libyan Arab Jamahirya,*
    775 F. Supp. 2d 48 (D.D.C. 2011) .........................................................33

*Bauer v. Al Qaeda Islamic Army,*
    02-CV-7236 (GBD)(SN) ................................................................. *passim*

*Belkin v. Islamic Republic of Iran,*
    667 F. Supp. 2d 8 (D.D.C. 2009) ..........................................................28

*Blais v. Islamic Republic of Iran,*
    459 F. Supp. 2d 40 (D.D.C. 2006) .........................................................24

*Com. Bank of Kuwait v. Rafidain Bank,*
    15 F.3d 238 (2d Cir. 1994) ...............................................................11

*Dammarell v. Islamic Republic of Iran,*
    281 F. Supp. 2d 105 (D.D.C. 2003), *vacated on other grounds*, 404 F. Supp.
    2d 261 (D.D.C. 2005) ....................................................................27

*Est. of Bland v. Islamic Republic of Iran,*
    831 F. Supp. 2d 150 (D.D.C. 2011) ........................................................28

*Est. of Heiser v. Islamic Republic of Iran,*
    466 F. Supp. 2d 229 (D.D.C. 2006) .............................................5, 13, 19, 28

*Fain v. Islamic Republic of Iran,*
    856 F. Supp. 2d 109 (D.D.C. 2012) ........................................................13

*Flatow v. Islamic Republic of Iran,*
    999 F. Supp. 1 (D.D.C. 1998) ..........................................................24, 30

*Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic,*
    582 F.3d 393 (2d Cir. 2009) ..............................................................10

*Gates v. Syrian Arab Republic,*
    580 F. Supp. 2d 53 (D.D.C. 2008) .........................................................23

*Gladys Lopez, et al. v. Islamic Republic of Iran,*
    No. 1:23-cv-08305 (GBD)(SN) ......................................................... *passim*

docs-100717636.1

## TABLE OF AUTHORITIES
### (*continued*)

**Page(s)**

*Haim v. Islamic Republic of Iran*,
  784 F. Supp. 2d 1 (D.D.C. 2011) ........................................................................12

*Harrison v. Republic of Sudan*,
  882 F. Supp. 2d 23 (D.D.C. 2012) .......................................................................12

*Havlish, et al. v. Bin Laden, et al.*,
  No. 03-CV-9848-GBD, ECF No. 294 (S.D.N.Y. Dec. 22, 2011) .................................. *passim*

*Int'l Road Fed'n v. Embassy of the Democratic Republic of the Congo*,
  131 F. Supp. 2d 248 (D.D.C. 2001) ......................................................................11

*In re Islamic Republic of Iran Terrorism Litig.*,
  659 F. Supp. 2d 31 (D.D.C. 2009) .................................................................22, 24

*Leibovitch v. Syrian Arab Republic*,
  25 F. Supp. 3d 1071 (N.D. Ill. 2014) ...................................................................13

*Murphy v. Islamic Republic of Iran*,
  740 F. Supp. 2d 51 (D.D.C. 2010) .......................................................................13

*Owens v. Republic of Sudan*,
  2011 WL 5966900 (D.D.C. Nov. 28, 2011) ...........................................................19

*Owens v. Republic of Sudan*,
  826 F. Supp. 2d 128 (D.D.C. 2011) ....................................................14, 18, 19, 22

*Peterson v. Islamic Republic of Iran*,
  264 F. Supp. 2d 46 (D.D.C. 2003) .......................................................................13

*Rimkus v. Islamic Republic of Iran*,
  575 F. Supp. 2d 181 (D.D.C. 2008) .....................................................................11

*Rimkus v. Islamic Republic of Iran*,
  750 F. Supp. 2d 163 (D.D.C. 2010) ................................................................12, 13

*Roeder v. Islamic Republic of Iran*,
  333 F.3d 228 (D.C. Cir. 2003) ............................................................................11

*Roth v. Islamic Republic of Iran*,
  78 F. Supp. 3d 379 (D.D.C. 2015) .......................................................................31

*Rux v. Republic of Sudan*,
  495 F. Supp. 2d 541 (E.D. Va. 2007) ...................................................................24

*Samantar v. Yousuf*,
  560 U.S. 305 (2010) ...........................................................................................7

## TABLE OF AUTHORITIES
### (*continued*)

**Page(s)**

*In re Sept. 11 Litig.*,
  802 F.3d 314 (2d Cir. 2015) ............................................................. 34

*Shapiro v. Republic of Bolivia*,
  930 F.2d 1013 (2d Cir. 1991) ............................................................ 10

*Smith ex rel. Smith v. Islamic Emirate of Afghanistan*,
  262 F. Supp. 2d 217 (S.D.N.Y. 2003), *amended sub nom. Smith ex rel. Est. of
  Smith v. Islamic Emirate of Afghanistan*, No. 01 CIV.10132 (HB), 2003 WL
  23324214 (S.D.N.Y. May 19, 2003 ...................................................... 11

*Surette v. Islamic Republic of Iran*,
  231 F. Supp. 2d 260 (D.D.C. 2002) ..................................................... 28

*In re Terrorist Attacks on Sept. 11, 2001*,
  741 F.3d 353 (2d Cir. 2013) ............................................................... 9

*Ungar v. Islamic Republic of Iran*,
  211 F. Supp. 2d 91 (D.D.C. 2002) ...................................................... 11

*United States v. Quintieri*,
  306 F.3d 1217 (2d Cir. 2002) .............................................................. 9

*Valore v. Islamic Republic of Iran*,
  478 F. Supp. 2d 101 (D.D.C. 2007) ..................................................... 11

*Valore v. Islamic Republic of Iran*,
  700 F. Supp. 2d 52 (D.D.C. 2010) ................................................ *passim*

*Weinstein v. Islamic Republic of Iran*,
  175 F. Supp. 2d 13 (D.D.C. 2001) ...................................................... 12

*Weinstein v. Islamic Republic of Iran*,
  184 F. Supp. 2d 13 (D.D.C. 2002) ...................................................... 11

*Wultz v. Islamic Republic of Iran*,
  864 F. Supp. 2d 24 (D.D.C. 2012) ...................................................... 12

### Statutes

18 U.S.C. § 2339A ........................................................................ 23, 24

28 U.S.C. § 1605A ...................................................................... *passim*

28 U.S.C. § 1608 ............................................................... 1, 10, 11, 35

docs-100717636.1

**TABLE OF AUTHORITIES**
**(*continued*)**

**Page(s)**

Air Transportation Safety and System Stabilization Act ("ATSSSA").  Pub. L.
No. 107-42, 115 Stat. 230 (2001) (codified as amended at 49 U.S.C. § 40101) ....................34

Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, 130 Stat. 852
(2016) ...........................................................................................................................................8

**Other Authorities**

Fed. R. Civ. P. 50(a) ..................................................................................................................11

United States Department of State, *State Sponsors of Terrorism*,
https://www.state.gov/state-sponsors-of-terrorism/ (last visited October 17,
2024) ..........................................................................................................................................16

White House, *President Donald J. Trump Is Holding the Iranian Regime
Accountable for Its Global Campaign of Terrorism*,
https://trumpwhitehouse.archives.gov/briefings-statements/president-donald-j-
trump-holding-iranian-regime-accountable-global-campaign-terrorism/ ...............................17

docs-100717636.1

## I.    INTRODUCTION

Plaintiffs in the above-captioned actions, by and through their counsel, Anderson Kill P.C., respectfully submit this Memorandum of Law in support of their Motion for Partial Final Judgments as to both Liability and Damages against the Defendant Islamic Republic of Iran ("Iran"), pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A.

This action arises out of the events of September 11, 2001, during which members of the al Qaeda[1] terrorist network hijacked four commercial airliners and used those planes as weapons in coordinated terrorist attacks on the United States (the "September 11th Attacks"). Plaintiffs in the above-captioned cases are comprised of personal representatives and eligible family members of individuals killed in the September 11th Attacks.

First, all of the Plaintiffs in *Gladys Lopez, et al. v. Islamic Republic of Iran*, No. 1:23-cv-08305 (GBD)(SN) ("*Lopez*") now respectfully request a judicial determination that service of process was properly effected upon Iran in accordance with 28 U.S.C. § 1608(a) for sovereign defendants and 28 U.S.C. § 1608(b) for agencies and instrumentalities of sovereign defendants.

Second, all of the Plaintiffs in *Lopez* respectfully request entry of judgments by default against Iran on the issue of liability, solely as to the Plaintiffs' substantive causes of action established under the FSIA's state sponsor of terrorism exception, codified at 28 U.S.C. § 1605A(c).[2]

---

[1] Arabic words and names are spelled differently in various sources. Plaintiffs have strived for consistency as much as possible, but original spellings are maintained in quoted sources.

[2] As discussed below, this request for default judgment on liability against Iran under the state sponsor of terrorism exception has already been addressed by this Court in proceedings in related litigation in *In re Terrorist Attacks on September 11, 2001*, 03 MDL 1570. While the within Plaintiffs are not at this time seeking judgment on their other claims asserted in the complaint, they reserve their right to do so in the future.

Significantly, on the issue of liability, this Court has already entered judgment against Iran for substantially similar claims in multiple related matters consolidated before this Court under *In re Terrorist Attacks on September 11, 2001*, 03 MDL 1570, based on a full evidentiary record and hearing pursuant to the FSIA. The extension of those rulings to all plaintiffs is both appropriate and consistent with the specific objectives that prompted the Judicial Panel for Multidistrict Litigation to centralize each of those proceedings before this Court.

Further, for the reasons set forth below, the statements contained in the Declaration of Jerry S. Goldman, Esq., with exhibits appended thereto and tendered under seal ("Goldman Declaration"), which is being filed contemporaneously with this memorandum of law, as well as those set forth in prior motions for liability and damages made on behalf of the *O'Neill* plaintiffs, certain plaintiffs in the above-referenced matters who are identified in Exhibit A and Exhibit B, annexed to the Goldman Declaration (which are Exhibit B and Exhibit C to the Proposed Order), by and through their counsel, Anderson Kill P.C., respectfully move this Court for an Order:

(1)    awarding the Plaintiffs identified in Exhibit A and Exhibit B damages judgments against Iran in the same amounts previously awarded by this Court to various similarly situated plaintiffs in *Burnett*, *Havlish*, *Ashton*, *Bauer*, *O'Neill*, and other cases; AND,

(2)    awarding solatium damages to those Plaintiffs identified in Exhibit A in the amounts of $12,500,000 per spouse, $8,500,000 per child, and $4,250,000 per sibling, as set forth in annexed Exhibit A; AND,

(3)    awarding the estates of 9/11 decedents, through their personal representatives and on behalf of all survivors and all legally entitled beneficiaries and family members of such 9/11 decedents, as set forth in Exhibit B, compensatory damages

for pain and suffering in the same per estate amount previously awarded by this Court regarding other estates of decedents killed in the September 11th attacks, as set forth in Exhibit B; AND,

(4)    awarding compensatory damages to the Plaintiffs identified in Exhibit B for decedents' pain and suffering in the amount of $2,000,000, as set forth in annexed Exhibit B; AND,

(5)    awarding the estates of 9/11 decedents, through their personal representatives and on behalf of all survivors and all legally entitled beneficiaries and family members of such 9/11 decedents, as identified in Exhibit B, an award of economic damages in the amounts set forth in Exhibit B; AND,

(6)    awarding the Plaintiffs identified in Exhibit A and Exhibit B prejudgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the damages judgment, in the amount of $_____; AND,

(7)    granting the Plaintiffs identified in Exhibit A and Exhibit B permission to seek punitive damages, economic damages, and other appropriate damages, at a later date, to the extent such awards have not previously been addressed; AND,

(8)    granting permission for all other Plaintiffs in these actions not appearing in Exhibit A and Exhibit B to submit applications for damages awards in later stages, to the extent such awards have not previously been addressed; AND,

(9)    granting to the Plaintiffs such other and further relief as this Honorable Court deems just and proper.

3

## II.    PRELIMINARY STATEMENT

### A.    Orders

This motion is being submitted in accordance with various procedural orders entered by this Court, and the form of this motion and the relief requested herein are intended to comply with various orders of this Court, including the following:

a.    The Court's January 24, 2017 Order, ECF No. 3435,[3] requiring that "[a]ll further motions for final judgment against any defaulting defendant shall be accompanied by a sworn declaration attesting that the attorney has (1) complied with the due diligence safeguards [referenced in Section II.D. of the January 23, 2017 letter from the Plaintiffs' Executive Committee (ECF No. 3433)] and (2) personally verified that no relief has previously been awarded to any plaintiff included in the judgment (or, if relief has been awarded, the nature of that relief)."

b.    The Court's October 14, 2016 Order, ECF No. 3363, concerning the amounts of solatium damage awards.

c.    The Court's October 14, 2016 Order, ECF No. 3362, related to the cases captioned as *Bauer v. Al Qaeda Islamic Army*, 02-CV-7236 (GBD)(SN) and *Ashton v. al Qaeda Islamic Army*, 02-CV-6977 (GBD)(SN).

d.    The Court's October 28, 2019 Order, ECF No. 5234, setting forth updated procedural rules.

e.    The Court's October 28, 2019 Order, ECF No. 5338, setting forth the scheduling order.

f.    The Court's May 5, 2022 Order, ECF No. 7963, setting forth procedures for filing expert reports submitted in support of default judgments.

g.    The Court's September 22, 2023 Order, ECF No. 9355, setting forth procedures for default judgment motions.

h.    The Court's October 7, 2024 Order, ECF No. 10411, regarding expert reports submitted in support of economic damages judgment motions.

---

[3] All ECF numbers are to the MDL docket unless stated otherwise.

B.    **Related Cases**

Relying on evidence and arguments[4] submitted by plaintiffs in *In re Terrorist Attacks on September 11, 2001*, 03-md-1570, the consolidated multidistrict litigation arising out of the September 11th Attacks, this Court on December 22, 2011, and again on August 31, 2015, granted Orders of Judgment on Liability in favor of certain of the *Havlish*, *Ashton*, *O'Neill*, *Federal Insurance*, and *Hoglan* groups of plaintiffs against Iran. *See, e.g.*, ECF Nos. 2516, 3014, 3016, 3020-23. Subsequently, other liability findings were made for additional *O'Neill* Plaintiffs. After granting the *Havlish* Order of Default Judgment on Liability, this Court considered the issue of damages suffered by the *Havlish* plaintiffs and their decedents. Upon the submissions of the *Havlish* plaintiffs, on October 3, 2012, this Court found, among other things, that "Plaintiffs may recover for [, inter alia,] solatium . . . in an action under Section 1605A. 28 U.S.C. § 1605A(c)(4). In such an action, . . . family members can recover solatium for their emotional injury; and all plaintiffs can recover punitive damages." ECF No. 2623 at 2-3, quoting *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 83 (D.D.C. 2010). This Court also found that the following solatium awards for family members are appropriate, as an upward departure from the framework in *Est. of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006).

---

[4] In each of the Orders of Judgment regarding plaintiffs' claims against Iran in the *In re Terrorist Attacks on September 11, 2001* multidistrict litigation, the Court premised its determination "[u]pon consideration of the evidence submitted by the Plaintiffs in filings with this Court on May 19, 2011, July 13, 2011, and August 19, 2011, and the evidence presented at the December 15, 2011, hearing on liability, together with the entire record in this case." ECF Nos. 2516, 3014, 3016, 3020-22; *see also* ECF No. 3023 (substantially similar language).

| Relationship of Decedent | Solatium Award |
|---|---|
| Spouse | $12,500,000 |
| Parent | $8,500,000 |
| Child | $8,500,000 |
| Sibling | $4,250,000 |

ECF No. 2623 at 4.

The Court has applied the same solatium values to claims of other solatium plaintiffs in *Burnett* (ECF Nos. 3666, 4023, 4126, 4146, 4175, 5061, 5062, 5087, 5138, and 5356) and other solatium plaintiffs in other cases coordinated in the *In re Terrorist Attacks on September 11, 2001* multidistrict litigation. *See, e.g.*, ECF Nos. 3175 at 2, 3300 at 1, 3358 at 9, 3363 at 16, 3399, and 3977 at 7.

In that same decision in *Havlish*, this Court also found that Plaintiffs are entitled to punitive damages under the FSIA in an amount of 3.44 multiplied by their compensatory damages award. ECF No. 2623 at 5. The Court has applied that 3.44 multiplier also to judgments in *Ashton*. *See* ECF No. 3175 at 3 (Report and Recommendation to apply 3.44 punitive multiplier); *see also* ECF No. 3229 at 1 (Order adopting in its entirety Report and Recommendation to apply 3.44 punitive multiplier). The Court applied the 3.44 punitive multiplier to the compensatory awards previously awarded in *Burnett*. ECF No. 3666. However, in *Hoglan*, another case in this multidistrict litigation, Magistrate Judge Netburn recommended that the plaintiffs' request for punitive damages be denied without prejudice. ECF Nos. 3358 at 11-16, 3363 at 28. Judge Daniels adopted Magistrate Judge Netburn's Report and Recommendation in its entirety. ECF Nos. 3383 at 2, 3384 at 6.

6

In the *Havlish* decision, this Court also found that prejudgment interest was warranted for the Plaintiffs' solatium damages. ECF No. 2623 at 5. The *Havlish* plaintiffs sought application of a 4.96% interest rate, which the magistrate judge recommended (ECF No. 2619 at 13-14) and Judge Daniels adopted (ECF No. 2623 at 5). In *Ashton*, plaintiffs sought, and the magistrate judge recommended, application of a statutory nine percent simple interest rate for prejudgment interest. ECF No. 3175 at 7-8. Judge Daniels adopted the magistrate judge's report and recommendation and applied the nine percent interest rate in multiple instances in *Ashton* and *Bauer*. *See* ECF Nos. 3229 at 2, 3300 at 1, 3341 at 1. However, in *Hoglan*, Magistrate Judge Netburn recommended that the 4.96 percent rate for prejudgment interest should be applied to all solatium claims, ECF Nos. 3358 at 17-20, 3363 at 28-29. Judge Daniels adopted Magistrate Judge Netburn's *Hoglan* Report and Recommendation in its entirety and applied an interest rate of 4.96 percent per annum, compounded annually. ECF Nos. 3383 at 2, 3384 at 6. The Court applied that interest rate, 4.96 percent per annum, to the awards to other plaintiffs in *Burnett*.

C.   **Jurisdiction**

The FSIA provides the "sole basis for obtaining jurisdiction over a foreign state in federal court." *Samantar v. Yousuf*, 560 U.S. 305, 314 (2010) (citing *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989)). Under the architecture of the FSIA, foreign states are presumed to be immune from suit in the courts of the United States unless one of the FSIA's enumerated exceptions to immunity applies. *See* 28 U.S.C. §§ 1605-1605A; *Samantar*, 560 U.S. at 305. As discussed below, this Court previously held that subject matter jurisdiction exists for claims against Iran for injuries resulting from the September 11th Attacks under two separate, independent provisions of the FSIA: the state sponsor of terrorism exception (28 U.S.C.

§ 1605A) and the noncommercial tort exception (28 U.S.C. § 1605(a)(5)).[5]  *See* the Court's

Findings of Fact and Conclusions of Law in *Havlish, et al. v. Bin Laden, et al.*, No. 03-CV-9848-

GBD, ECF No. 294 (S.D.N.Y. Dec. 22, 2011), hereinafter referred to as "Court Findings," ECF

No. 294 at 46 ¶ 4.  Those rulings control in relation to the present application, although this

motion focuses solely on the jurisdictional grant and substantive remedies provided under

Section 1605A.

Also as discussed below, Plaintiffs have properly effected service of process on Iran,

perfecting personal jurisdiction over Iran under the FSIA as well.

### 1.    This Court Has Subject Matter Jurisdiction Over Iran

In *Havlish*, this Court concluded that it had subject matter jurisdiction for claims against

Iran for injuries resulting from the September 11th Attacks pursuant to both Sections 1605A and

1605(a)(5) of the FSIA, explaining as follows:

> Subject matter jurisdiction exists if the defendant's conduct falls
> within one of the specific statutory exceptions to immunity.  *See* 28
> U.S.C. §§ 1330(a) and 1604.  *Owens v. Republic of Sudan*, 2011
> WL 5966900 (D.D.C. Nov. 28, 2011).  Here, this Court has
> jurisdiction because service was proper and defendants' conduct
> falls within both the "state sponsor of terrorism" exception set
> forth in 28 U.S.C. § 1605A and the "noncommercial tort"
> exception of § 1605(a)(5).

*See* Court Findings, ECF No. 294 at 46 ¶ 4.

As to liability against Iran through the present motion, the *Lopez* Plaintiffs seek the entry

of default judgment in relation to their substantive causes of action arising under Section 1605A,

and thus only the exception to immunity provided under that section is implicated by the instant

---

[5] On September 28, 2016, Congress enacted the Justice Against Sponsors of Terrorism Act, Pub.
L. No. 114-222, 130 Stat. 852 (2016) ("JASTA"), which provides an additional ground for
jurisdiction and liability against Iran. *See* ECF No. 9931.

proceedings.  With respect to the issue of jurisdiction, this Court's prior holding that

Section 1605A provides a proper basis for subject matter jurisdiction for claims against Iran for

injuries resulting from the September 11th Attacks is controlling, and the issue need not, and

indeed should not, be re-litigated in the context of the present default judgment proceedings.  *In

re Terrorist Attacks on Sept. 11, 2001*, 741 F.3d 353, 358 (2d Cir. 2013) (explaining that the

"September 11 cases were centralized in part in order to 'prevent inconsistent pretrial rulings'");

*see also United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002) (internal quotations

omitted) ("when a court has ruled on an issue, that decision should generally be adhered to by

that court in subsequent stages in the same case").

As in *Havlish*, the Plaintiffs' actions assert claims against Iran for wrongful deaths and

personal injuries resulting from the September 11th Attacks, based on Iran's extensive

sponsorship of al Qaeda during the decade leading up to the attacks, and direct support for

critical aspects of the 9/11 operation itself.  The evidentiary and factual record supporting the

present claims is identical to the record this Court considered in issuing judgment against Iran in

*Havlish*.  Given the similarity of the present claims to those present in *Havlish*, there can be no

dispute that this Court's ruling that Section 1605A provided a proper basis for jurisdiction for the

claims against Iran in *Havlish* also controls as to the wrongful death and personal injury claims

asserted in the Plaintiffs' actions.

For example, this Court has also previously extended the ruling in *Havlish* to apply to

other related actions against Iran pending in the *In re Terrorist Attacks on September 11, 2001*

multidistrict litigation, namely *Hoglan*, *Federal Insurance*, *Ashton*, *Burnett*, and *O'Neill*.

*Hoglan, et al. v. Islamic Rep. of Iran, et al.*, 1:11-cv-07550-GBD, ECF No. 112 (Aug. 31, 2015);

9

*In re Terrorist Attacks on September 11, 2001*, ECF Nos. 3021 (*Ashton*), 3022 (*O'Neill*), 3020 (*Federal Ins.*) (Aug. 31, 2015), 3443 (*Burnett*) (Jan. 31, 2017).

For all the foregoing reasons, this Court's prior ruling concerning the applicability of Section 1605A to claims against Iran for injuries resulting from the September 11th Attacks applies with full force to the claims asserted against Iran in the Plaintiffs' matter.

### 2. This Court has Personal Jurisdiction over Iran

"Under the FSIA, . . . personal jurisdiction equals subject matter jurisdiction plus valid service of process." *Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1020 (2d Cir. 1991).[6] Service under the FSIA is governed by 28 U.S.C. § 1608(a). The complaints were filed, and Affidavits of Service were filed regarding service on Iran, as set forth in annexed Exhibit A to the Proposed Order.

### D. The Clerk Properly Entered Default Against Iran.

Clerk's Certificates of Default were entered against Iran in the above-referenced matters, as set forth in annexed Exhibit A to the Proposed Order.

## III. JUDGMENT AGAINST IRAN AS TO LIABILITY FOR THE *LOPEZ* PLAINTIFFS SHOULD BE ENTERED

### A. Legal Standard for FSIA Default Judgment as to Liability

Under the FSIA, "[n]o judgment by default shall be entered by a court of the United States or of a State against a foreign state…unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e); *see also Reed*, 845 F. Supp. 2d at 211 (considering evidence presented by plaintiffs after satisfaction of jurisdictional

---

[6] The Second Circuit has ruled that foreign states are not persons within the meaning of the Due Process Clause. *Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 582 F.3d 393, 399-401 (2d Cir. 2009). Thus, the personal jurisdiction analysis as to Iran does not include a due process component.

requirements); *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 232 (D.C. Cir. 2003) ("The court still has an obligation to satisfy itself that plaintiffs have established a right to relief."). To prevail in a FSIA default proceeding, a plaintiff must present a "legally sufficient evidentiary basis for a reasonable jury to find for plaintiff." *Ungar v. Islamic Republic of Iran*, 211 F. Supp. 2d 91, 98 (D.D.C. 2002). This standard is the same standard used for granting judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a). *See, e.g.*, *Smith ex rel. Smith v. Islamic Emirate of Afghanistan*, 262 F. Supp. 2d 217, 223 (S.D.N.Y. 2003), *amended sub nom. Smith ex rel. Est. of Smith v. Islamic Emirate of Afghanistan*, No. 01 CIV.10132 (HB), 2003 WL 23324214 (S.D.N.Y. May 19, 2003) (adopting standard used in *Ungar* and finding Iraq liable for September 11, 2001 terrorist acts).

Courts within the Second Circuit have noted that the proper standard for establishing liability under the FSIA should be "less than normally required," *Id.* at 223, and that a plaintiff needs merely to demonstrate a *prima facie* case to obtain a judgment of liability in a FSIA case. *See Ungar*, 211 F. Supp. 2d at 98. A plaintiff meets its burden of proof by affidavit or similar evidence, *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 19 (D.D.C. 2002), and a court considering entry of default judgment may "accept plaintiffs' uncontroverted evidence as true." *Rimkus v. Islamic Republic of Iran*, 575 F. Supp. 2d 181, 193 (D.D.C. 2008); *Valore v. Islamic Republic of Iran*, 478 F. Supp. 2d 101, 106 (D.D.C. 2007).

Section 1608(e) does not require a new evidentiary hearing to establish liability when a foreign sovereign is in default. *See Com. Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 242 (2d Cir. 1994) (finding evidence in form of affidavits and exhibits sufficient to satisfy § 1608(e)); *Int'l Road Fed'n v. Embassy of the Democratic Republic of the Congo*, 131 F. Supp. 2d 248, 262 (D.D.C. 2001) (accepting as true plaintiffs' uncontroverted factual allegations supported by

documentary and affidavit evidence without evidentiary hearing).  Instead, a plaintiff seeking a

default judgment under the FSIA may meet its burden by entering into evidence certified

transcripts of relevant testimony presented in a previous proceeding.  *See Weinstein v. Islamic

Republic of Iran*, 175 F. Supp. 2d 13, 22 (D.D.C. 2001) (adopting findings by relying on

affidavit testimony and certified transcript from another proceeding is sufficient to establish

Iran's provision of material support and resources to al Qaeda).  In lieu of filing affidavits from

witnesses that testified in a previous case, plaintiffs may submit certified copies of the witnesses'

transcript from the previous case to establish particular facts.  *See Weinstein*, 175 F. Supp. 2d at

22; *see also Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 31 (D.D.C. 2012) ("when a court

has found facts relevant to a FSIA case involving material support to terrorist groups, courts in

subsequent, related cases may 'rely upon the evidence presented in earlier litigation . . . without

necessitating the formality of having that evidence reproduced'" (quoting *Taylor v. Islamic

Republic of Iran*, 811 F. Supp. 2d 1, 7 (D.D.C. 2011)); *see also Haim v. Islamic Republic of Iran*,

784 F. Supp. 2d 1, 10 (D.D.C. 2011) (taking judicial notice of sworn testimony and documentary

evidence presented in prior proceedings which arose out of the 1995 Gaza strip bombing at issue

in *Haim*).

Additionally, taking into account the "multiplicity of FSIA-related litigation," *Rimkus v.

Islamic Republic of Iran*, 750 F. Supp. 2d 163, 172 (D.D.C. 2010), courts acknowledge that "a

FSIA court may 'take judicial notice of related proceedings and records in cases before the same

court.'" *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 29 (D.D.C. 2012), quoting

*Valore*, 700 F.Supp.2d at 59.

Although judicial notice of findings of fact does not itself establish the truth of such facts

under the Federal Rules of Evidence, "'the FSIA does not require this Court to re-litigate issues

that have already been settled' in previous decisions. . . . Instead, the Court may review evidence

considered in an opinion that is judicially noticed, without necessitating the re-presentment of

such evidence." *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 59 (D.D.C. 2010)

(quoting *Heiser*, 466 F. Supp. 2d at 264  (taking judicial notice of findings of fact and

conclusions of law made in *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46 (D.D.C.

2003), which also arose out of the 1983 Beirut bombing); *Fain v. Islamic Republic of Iran*, 856

F. Supp. 2d 109 (D.D.C. 2012) (same); *Heiser*, 466 F. Supp. 2d at 263 (taking judicial notice of

factual findings made in case brought against same defendants for damages arising from the

same 1996 attack on Khobar Towers); *see also Leibovitch v. Syrian Arab Republic*, 25 F. Supp.

3d 1071 (N.D. Ill. 2014) (taking judicial notice of findings of fact in related proceedings arising

out of terrorist attack where defendants failed to appear or otherwise plead).

> [T]he statutory obligation found in § 1608(e) was not designed to
> impose the onerous burden of re-litigating key facts in related
> cases arising out of the same terrorist attack. . . . Rather, the
> requirement was intended to ensure that the courts give proper
> deference to the political branches' predominant role in foreign
> affairs by pausing to ensure the validity of their actions before
> undertaking the substantial step of piercing sovereign immunity
> and entering judgment against a foreign state.  Mindful of these
> interests, courts in FSIA litigation have adopted a middle-ground
> approach that permits courts in subsequent related cases to rely
> upon the evidence presented in earlier litigation—without
> necessitating the formality of having that evidence reproduced—to
> reach their own, independent findings of fact in the cases before
> them.

*Rimkus*, 750 F. Supp. 2d at 172.

**B.    Plaintiffs State a Cause of Action Under the Terrorism Exception of the
       FSIA**

In addition to establishing a basis for subject matter jurisdiction for the *Lopez* Plaintiffs'

claims against Iran, Section 1605A also provides a substantive cause of action imposing liability

against Iran for the Plaintiffs' injuries.  Pursuant to Section 1605A(c), a country designated as a

13

State Sponsor of Terrorism shall be liable to a national of the United States for personal injury or death caused by that country's provision of material support or resources. *See* § 1605A(a)(1), (c). As the District Court for the District of Columbia explained in 2011:

> A straightforward reading of § 1605A(c) is that it creates a federal cause of action for four categories of individuals: a national of the United States, a member of the U.S. armed forces, a U.S. Government employee or contractor, or a legal representative of such a person . . . . The cause of action is further described as "for personal injury or death caused by acts described in subsection (a)(1) of that foreign state, or of an official employee or agent of that foreign state, for which the courts of the United States may maintained jurisdiction under this section for money damages.

*Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 153 (D.D.C. 2011) ("liability under section 1605A(c) will exist whenever the jurisdictional requirements of section 1605A are met") (citing *Calderon-Cardona v. Democratic People's Republic of Korea*, 723 F. Supp. 2d 441, 460 (D.P.R. 2010)).

Section 1605A(c) authorizes the recovery of economic damages, solatium, pain and suffering, and punitive damages.

### C.    There Is a Factual Basis for Establishing Liability

The *Lopez* Plaintiffs seek entry of default judgment as to liability against Iran based on Iran's provision of material support to al Qaeda and direct support for, and sponsorship of, the September 11th Attacks. As set forth below, Iran provided material support and resources to al Qaeda and bin Laden both directly and through Iran surrogate, Hezbollah. The support provided by Iran assisted in, and contributed to, the preparation and execution of the plans that culminated in the September 11th Attacks. Without Iran's active and enthusiastic support, al Qaeda could never have carried out those attacks.

The government of Iran has a long history of providing material support and resources to terrorist organizations targeting the United States and its citizens, including al Qaeda. In 2011,

14

in the *Havlish* case and as part of the *In re Terrorist Attacks on September 11, 2001 MDL*, this Court specifically outlined Iran's longstanding role in the development of the al Qaeda network and direct support for the September 11th Attacks themselves.[7]  This Court's factual findings in the *Havlish* proceeding are supported by an array of government reports, including the Final Report of the National Commission on Terrorist Attacks Upon the United States (the "9/11 Commission").  Among other relevant findings as to Iran, the 9/11 Commission concluded that Iran forged a cooperation agreement with al Qaeda in the early 1990's, pursuant to which Iran provided a range of training and assistance to al Qaeda for nearly a decade leading up to the September 11th Attacks; and that Iran facilitated the travel of senior al Qaeda figures and several of the future 9/11 hijackers into Afghanistan, thereby directly assisting al Qaeda in the planning and execution of the September 11th Attacks.  *See* The 9/11 Commission Report (the "9/11 Final Report") at 60-61, 240-241.[8]

The *Lopez* Plaintiffs submit that the 9/11 Commission's findings as to the nature and scope of Iran's sponsorship of al Qaeda are themselves sufficient to support entry of judgment by default in these proceedings.  Moreover, these findings were further corroborated by affidavits of terrorism experts Dietrich L. Snell, Dr. Daniel L. Byman, Janice L. Kephart, Dr. Patrick Clawson, Claire M. Lopez, Dr. Bruce D. Tefft, Dr. Ronen Bergman, and Kenneth Timmerman, submitted of record in the *Havlish* default proceedings.  Citing both the government reports of record and the corroborating affidavits, this Court recognized Iran's critical role in enabling and facilitating al Qaeda's terrorist activities, concluding, for example, that "there is clear and convincing evidence pointing to the involvement on the part of Hezbollah and Iran in the 9/11

---

[7] *See Havlish v. Bin Laden*, No. 03-CV-9848-GBD, ECF No. 294 (S.D.N.Y. Dec. 22, 2011).

[8] The 9/11 Commission Report, http://govinfo.library.unt.edu/911/report/911Report.pdf, accessed February 27, 2023.

docs-100717636.1

attack, especially as it pertains to travel facilitation and safe haven." *See* Court Findings, ECF No. 294 at 35 ¶ 213 (citing Ex. 5, Snell Aff. ¶ 23). "Iran's facilitation of the hijackers' terrorist travel operation constituted material support – indeed direct support – for al Qaeda 9/11 attacks," Court Findings, ECF No. 294 at 39 ¶ 234 (citing Ex.4, Kephart Aff. ¶ 66), and that evidence of record "leaves no doubt that al Qaeda and the official Iranian Regime at the highest levels have been acting in concert to plot and execute attacks against the United States since early 1990s." Court Findings, ECF No. 294 at 41 ¶ 247 (citing Ex. 6, Lopez-Tefft Aff. ¶ 352).

### 1.    United States' Recognition of Iran as a State Sponsor of Terrorism

The United States Government has recognized and condemned Iran's support of terrorist attacks for over forty (40) years. Since January 19, 1984, Iran has been designated by the United States Secretary of State as a State Sponsor of Terrorism on the basis that it "repeatedly provided support for acts of international terrorism." U.S. Department of State, *State Sponsors of Terrorism*, https://www.state.gov/state-sponsors-of-terrorism/ (last visited October 17, 2024). As a designated State Sponsor of Terrorism, Iran is subject to restrictions on exports and imports, prohibitions on economic assistance and financial and other restrictions. On March 16, 1995, in response to Iranian support of international terrorism, President Clinton issued Executive Order 12957, which prohibited United States involvement with petroleum development in Iran. On May 6, 1995, President Clinton strengthened these sanctions by signing Executive Order 12959, pursuant to the International Emergency Economic Powers Act (50 USCS § 1701). President Clinton imposed additional restrictions on Iran pursuant to Executive Order 13059 on August 19, 1997. This Order reflected the Executive Branch's intent to prohibit virtually all trade and investment activities with Iran by United States persons.

To be sure, Iran's status as a state sponsor of terrorism remains firmly in place today; as quoted in a White House statement dated April 8, 2019, then President Donald Trump

docs-100717636.1

confirmed: "The Iranian regime is the leading state sponsor of terror. It exports dangerous missiles, fuels conflicts across the Middle East, and supports terrorist proxies."[9]

### 2.   Iran's Training and Support of al Qaeda Operatives

This Court's prior findings of fact affirm that Iran "has engaged in, and supported, terrorism as an instrument of foreign policy, virtually from the inception of its existence after the Iranian Revolution in 1979." Court Findings, ECF No. 294 at 6 ¶ 1. Beginning in the mid-to-late 1980s, Iran began formulating contingency plans for anti-United States terrorist operations. *Id.* at 15 ¶ 70. As this Court already has found:

> In the early 1990s, casting aside the historic bitterness between the Sunni and Shi'a sects of Islam, Sudanese religious-political leader Hassan al Turabi and Iran's political leadership and intelligence agencies established close ties, including paramilitary and intelligence connections, beginning a united Sunni-Shiite front against the United States and the West. . . .
>
> While Osama bin Laden and al Qaeda were headquartered in Sudan in the early 1990s, Hassan al Turabi fostered the creation of a foundation and alliance for combined Sunni and Shi'a opposition to the United States and the West, an effort that was agreed to and joined by Osama bin Laden and Ayman al Zawahiri, leaders of al Qaeda, and by the leadership of Iran. . . .

Court Findings, ECF No. 294 at 16 ¶¶ 72-73. Though Iran and Hezbollah are largely Shiite and al Qaeda is Sunni, according to the 9/11 Final Report, "[t]he relationship between al Qaeda and Iran demonstrated that Sunni-Shia divisions did not necessarily pose an insurmountable barrier to cooperation in terrorist operations." *Id.* at 15 ¶ 69 (citing 9/11 Final Report at 61).

---

[9] White House, *President Donald J. Trump Is Holding the Iranian Regime Accountable for Its Global Campaign of Terrorism,* https://trumpwhitehouse.archives.gov/briefings-statements/president-donald-j-trump-holding-iranian-regime-accountable-global-campaign-terrorism/, accessed February 27, 2023.

In 1991, bin Laden relocated his terrorist operation from Afghanistan and Pakistan to Sudan. According to the testimony of terrorism expert Dr. Matthew Levitt in a separate proceeding, the Iranian government played a "very active" role in Sudan when bin Laden operated from Khartoum. *See Owens*, 826 F. Supp. 2d at 136 (D.D.C. 2011). In 1991 or 1992, al Qaeda and Iranian operatives met in Sudan and "reached an informal agreement to cooperate in providing support for actions carried out primarily against Israel and the United States." Court Findings, ECF No. 294 at 16 ¶ 77 (citing 9/11 Final Report at 61). After these meetings, senior al Qaeda operatives traveled to Iran to receive explosives training. *Id.* at ¶ 78 (citing 9/11 Final Report at 61). In 1993, bin Laden and Ayman al Zawahiri met in Sudan to develop an "alliance of joint cooperation and support on terrorism" with Iran's master terrorist, Imad Mughniyah, and Iranian officials. Court Findings, ECF No. 294 at 16-17 ¶¶ 79-80.

> The 1993 meeting in Khartoum led to an ongoing series of communications, training arrangements, and operations among Iran, Hezbollah and al Qaeda. Osama bin Laden sent more terrorist operatives, including Saef al Adel (who would become number 3 in al Qaeda and its top 'military' commander), to Hezbollah training camps operated by Mughniyah and the IRGC [defendant, Islamic Revolutionary Guard Corps] in Lebanon and Iran. Among other tactics, Hezbollah taught bin Laden's al Qaeda operatives how to bomb large buildings, and Hezbollah also gave the al Qaeda operatives training in intelligence and security.

*Id.* at 17 ¶ 83. The al Qaeda-Iran-Hezbollah terrorist training continued throughout the 1990s. "At all times, Iran's Supreme Leader [Ayatollah Ali Hoseini Khamenei] was fully aware that Hezbollah was training such foreign terrorists." *Id.* at 18 ¶ 88.

In the years that followed, this terrorist alliance orchestrated and claimed responsibility for various terrorist attacks against the United States and its allies. *See, e.g.*, *Id.* at 18-22 ¶¶ 90-115. Consistent with the evidence also endorsed by this Court, the United States District Court for the District of Columbia held that Iran was factually and legally responsible for the June 25,

18

1996 bombing of the Khobar Towers housing complex in Dhahran, Saudi Arabia. *See Heiser*, 466 F. Supp. 2d at 229. Al Qaeda was involved in the planning of and preparation for the bombing. *See* Court Findings, ECF No. 294 at 20 ¶ 104. Shortly thereafter, in August 1996, an Iranian intelligence operative involved in the Khobar Towers attack met with bin Laden in Jalalabad, Afghanistan to continue developing their joint terrorism campaign against the United States. *Id.* at 20-21 ¶ 106.

> At this time, Iranian and Hezbollah trainers traveled between Iran and Afghanistan, transferring to al Qaeda operatives such material as blueprints and drawings of bombs, manuals for wireless equipment, and instruction booklets for avoiding detection by unmanned aircraft.

*Id.* at 21 ¶ 107 (citing Ex. 7, Bergman Aff. ¶ 68).

The United States District Court for the District of Columbia also recognized Iran's involvement in and responsibility for al Qaeda's August 7, 1998 bombings of the United States embassies in Kenya and Tanzania. *See Owens*, 826 F. Supp. 2d at 135. That court relied on testimony of Dr. Matthew Levitt to support its conclusion regarding Iran's direct assistance to al Qaeda operatives and its provision of explosives training to Bin Laden and al Qaeda, recognizing that the "government of Iran was aware of and authorized this training and assistance." *Id.* at 139. The *Owens* Court further found that "Iran regarded al Qaeda as a useful tool to destabilize U.S. interests. . . . [T]he government of Iran aided, abetted and conspired with Hezbollah, Osama Bin Laden, and al Qaeda to launch large-scale bombing attacks against the United States by utilizing the sophisticated delivery mechanism of powerful suicide truck bombs." *Id.* at 135. Moreover, the court in *Owens* recognized that "Hezbollah's assistance to al Qaeda would not have been possible without the authorization of the Iranian government." *Id.* at 138.

This Court's findings of fact further recognize that, in or around October 2000, a United States Defense Intelligence Agency analyst was in the process of identifying connections among

19

al Qaeda, Iranian intelligence agencies controlled by Iran's Supreme Leader, Hezbollah, and other terrorist groups. Court Findings, ECF No. 294 at 22 ¶ 114. On October 12, 2000, al Qaeda suicide bombers attacked the *U.S.S. Cole* in Yemen. According to the 9/11 Final Report, "Iran made a concerted effort to strengthen relations with al Qaeda after the October 2000 attack on the *USS Cole*." *Id.* at ¶ 115 (citing 9/11 Final Report at 240).

### 3. Iran's Support for the September 11, 2001 Attacks

In the *Havlish* proceeding, this Court held that "Iran furnished material and direct support for the 9/11 terrorists' specific terrorist travel operation" and the facilitation of al Qaeda's operatives' travel to training camps in Afghanistan was "essential for the success of the 9/11 operation." Court Findings, ECF No. 294 at 22 ¶¶ 116, 118-119. This finding is consistent with the statement in the 9/11 Final Report that "[f]or terrorists, success is often dependent on travel . . . . For terrorists, travel documents are as important as weapons." *Id.* at ¶ 117 (citing 9/11 Final Report at 384).

This Court's findings of fact confirm two separate, but related, ways in which Iran directly facilitated and supported al Qaeda relative to the September 11, 2001 attacks:

> The first way in which the Iranian government materially and directly supported the 9/11 terrorist travel operation was by ordering its border inspectors not to place telltale stamps in the passports of these future hijackers traveling to and from Afghanistan via Iran. Several of the 9/11 hijackers transited Iran on their way to or from Afghanistan, taking advantage of the Iranian practice of not stamping Saudi passports. Thus, Iran facilitated the transit of al Qaeda members into and out of Afghanistan before 9/11. Some of these were future 9/11 hijackers.
>
> * * *
>
> Iran's willingness to permit the undocumented admission and passage of al Qaeda operatives and 9/11 hijackers provided key material support to al Qaeda. By not stamping the hijackers' passports, by providing safe passage through Iran and into

20

> Afghanistan, and by permitting Hezbollah to receive the traveling group . . . Iran, in essence, acted as a state sponsor of terrorist travel.

*Id.* at 22, 24 ¶¶ 122, 132. This Court's findings on this point are corroborated by National Security Administration intercepts made available to the 9/11 Commission shortly before the publication of the 9/11 Final Report. *See Id.* at 123. Moreover, "[n]umerous admissions from lower level al Qaeda members who were interrogated at the detention facility at Guantanamo Bay confirm the existence of the clandestine Iran-Afghanistan passageway." *Id.* at 23 ¶ 128 (citing Ex. 2, Timmerman 2nd Aff. ¶¶ 115-19).

> The second way in which Iran furnished material and direct support for the 9/11 attacks was that a terrorist agent of Iran and Hezbollah helped coordinate travel by future Saudi hijackers. As found by the 9/11 Commission, "[i]n October 2000, a senior operative of Hezbollah [Imad Mughniyah] visited Saudi Arabia to coordinate activities there. He also planned to assist individuals in Saudi Arabia in traveling to Iran during November . . . ."
>
> * * *
>
> The "activities" that Mughniyah went to Saudi Arabia to "coordinate" revolved around the hijackers' travel, their obtaining new Saudi passports, and/or U.S. visas for the 9/11 operation, the hijackers' security, and the operation's security.

Court Findings, ECF No. 294 at 24-25 ¶¶ 134, 140. This Court found that those activities also "constituted direct and material support for the 9/11 conspiracy." *Id.* at 25 ¶ 144.

Additionally, Iran's provision of material support to al Qaeda continued after the September 11, 2001 attacks, "most significantly by providing safe haven to al Qaeda leaders and operatives, keeping them safe from retaliation from U.S. forces, which invaded Afghanistan." *Id.* at 33 ¶ 198. Indeed, the Department of State's *Patterns of Global Terrorism* report for calendar year 2002, released in April 2003 by the Secretary of State and Coordinator for

21

Counterterrorism, recognized that "al-Qaida members have found virtual safehaven there [in Iran] and may even be receiving protection from elements of the Iranian Government."[10]

In sum, it is by now well established that Iran provided al Qaeda with critical training and support, from the earliest stages of al Qaeda's formation through September 11, 2001, and even thereafter. Iran's assistance provided al Qaeda with the expertise and resources necessary to carry out large scale international terrorist attacks, and directly enabled al Qaeda to plan and carry out the September 11th Attacks. As this Court already has held, Iran's provision of material support and resources was instrumental in ultimately causing the deaths and injuries of the thousands who suffered from the September 11th Attacks, and subjects Iran to liability for those injuries.

**D.      Plaintiffs Have Established Material Support and Causation**

**1.      Plaintiffs Have Established Material Support**

The basis of Iran's liability is its provision of material support and resources to al Qaeda, as set forth above, which caused the September 11 Attacks and resulted in the death and injuries of thousands of United States citizens. *See, e.g.*, *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 59 (D.D.C. 2009) (explaining Iran's material support to Hamas in the form of funding, safe haven, training, and weapons was responsible for suicide attacks). In order to demonstrate that Plaintiffs have a cause of action under Section 1605A, Plaintiffs must satisfy the elements of Section 1605A(a)(1). *See Owens*, 826 F. Supp. 2d at 153.

In FSIA cases involving terrorist attacks caused by a foreign state's provision of material support or resources, a court must "determine whether a defendant country has provided material

---

[10] *See* United States Department of State, *Patterns of Global Terrorism 2002*, 77, https://2009-2017.state.gov/documents/organization/20117.pdf, accessed on 08/19/2022.

support to terrorism . . . consider[ing] first, whether a particular terrorist group committed the terrorist act[11] and second, whether the defendant foreign state generally provided material support or resources to the terrorist organization which contributed to its ability to carry out the terrorist act." *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 67 (D.D.C. 2008).

Section 1605A(h) adopts the definition of "material support or resources" set forth in 18 U.S.C. § 2339A:

> [T]he term "material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials[.]

18 U.S.C. § 2339A(b)(1).

The record evidence concerning Iran's support of al Qaeda easily satisfies this definition of "material support." Indeed, this Court already has entered a specific conclusion of law recognizing that Iran "provided material support and resources to al Qaeda for acts of terrorism" including the September 11, 2001 attacks. Court Findings, ECF No. 294 at 50 ¶ 17; *see also id.* at 47 ¶ 7 ("'plaintiffs have established that their injuries were caused by defendants' acts of 'extrajudicial killing' and/or the provision of 'material support for such acts'"). This conclusion clearly is correct, as the definition of material support prohibits the provision of any form of property or service to a terrorist organization, making specific reference to "expert advice or assistance" and "transportation" and "financial" services, all of which are forms of support Iran provided to al Qaeda. And the definition plainly recognizes the critical benefits terrorists obtain

---

[11] Al Qaeda's responsibility for committing the September 11th Attacks is undisputed and a matter plainly subject to judicial notice.

through any support that assists them in traveling, by expressly including "safehouse," "lodging," "false documentation or identification" and "transportation" as forms of prohibited support.  18 U.S.C. § 2339A(b)(1); *see also Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 55 (D.D.C. 2006) (recognizing provision of training and travel documents to facilitate acts constitutes material support); *Rux v. Republic of Sudan*, 495 F. Supp. 2d 541, 549-54 (E.D. Va. 2007) (safe haven); *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 18 (D.D.C. 1998) (superseded by enactment of Section 1605A) ("routine provision of financial assistance to a terrorist group in support of its terrorist activities constitutes 'providing material support or resources' for a terrorist act within the meaning of the [terrorism exception of the FSIA]").

### 2.    Plaintiffs Have Proved Causation

The applicable standard of causation is liberally construed in Section 1605A material-support cases—namely, in such cases, Plaintiffs do not need to demonstrate any direct nexus between the material support and the eventual terrorist act.[12] It has been established that a "plaintiff need not establish that the material support or resources provided by a foreign state for a terrorist act contributed directly to the act for which his claim arises in order to satisfy" the terrorism exception of the FSIA.  *Flatow*, 999 F. Supp. at 18; *see also, e.g.*, *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d at 44 (holding that there is no but-for causation requirement).

Once again, this Court already has determined that the record evidence concerning the material support Iran provided to al Qaeda is more than sufficient to satisfy the modest causation requirement of 1605A(c).  Indeed, this Court concluded that Iran's assistance "constituted direct

---

[12] Courts addressing liability under the FSIA generally are guided by the principles of the Restatement (Second) of Torts. *Reed*, 845 F. Supp. 2d at 212 (granting motion for default judgment pursuant to Section 1605A).

support and material support for al Qaeda's 9/11 attacks."  Court Findings, ECF No. 294 at 24

¶ 133 (citing 9/11 Final Report); *see also Id.* at 47 ¶ 7 ("'plaintiffs have established that their

injuries were caused by defendants' acts of 'extrajudicial killing' and/or the provision of

'material support for such acts'").

    **E.**    **The Basis for Judgment as to Liability Has Been Established**

This Court already has analyzed the evidentiary record submitted in the *Havlish*

proceeding, and as described above, issued findings of fact and law on the basis of that evidence.

Although additional materials could be offered to augment that record, the Court's holdings in

*Havlish* render any such supplementation unnecessary.  Under the circumstances, the submission

of additional or repetitive evidence would merely impose an unnecessary burden on the

resources of the Court.  To avoid that result, the Plaintiffs respectfully request that the Court

enter default judgment against Iran as to liability on the basis of the evidence the Court

previously received and analyzed, and which already forms part of the record in the related

multidistrict litigation proceeding for the September 11, 2001 terrorist attacks (03 MDL 1570).

As set forth in detail above, this Court's prior findings of fact, and the affidavits and

documentary evidence already of record, provide a detailed record of Iran's involvement with

and sponsorship of al Qaeda and the September 11, 2001 attacks, and are more than sufficient to

support entry of default judgment against Iran as to liability in this action, pursuant to the

liability standards governing their Section 1605A(c) claims.

## IV.    Damages – Governing Law

### A.    Background

Section 1605A of the FSIA permits a foreign state to be held accountable for acts of terrorism or the provision of material support or resources for acts of terrorism where the acts or provision of support or resources were engaged in by an official, employee, or agent of the foreign state while acting within the scope of his or her office, employment, or agency.  28 U.S.C. § 1605A(a)(1).  The statute specifies that damages are available "for personal injury or death," § 1605A(a)(1) and (c)(4), and include "economic damages, solatium, pain and suffering, and punitive damages." § 1605A(c)(4). Courts addressing the damages available under the statute have held that, among other damages recoverable, "family members [or the functional equivalents of such family members] can recover solatium for their emotional injury; and all plaintiffs can recover punitive damages."  ECF No. 2623 at 2-3 (quoting *Valore*, 700 F. Supp. 2d at 83).

Plaintiffs identified in annexed Exhibit A are immediate family members of those killed on 9/11, as demonstrated by documentary evidence of their familial relationship to a 9/11 decedent, such as birth or marriage certificates, sworn affidavits, official documents, or other documents signed under penalty of perjury, which attest to a familial relationship eligible for recovery.[13]  *See* Goldman Declaration at ¶ 5.

The Plaintiffs identified in annexed Exhibit B are the estates of victims who perished on 9/11, in claims asserted by their personal representatives, as demonstrated by documentary

---

[13] Such evidence is consistent with that contemplated in the Court's July 10, 2018 Order at ECF No. 4045.

evidence in the form of official documents from probate and administration proceedings from Surrogate's Court, Probate Court, Orphan's Court, and similar judicial bodies. *See* Goldman Declaration at ¶ 6.

With respect to the estate plaintiffs in annexed Exhibit B, each personal representative has provided the undersigned counsel with proof that they have been appointed by the court as the personal representative of the 9/11 decedent's estate. *See* Goldman Declaration at ¶ 7.

As liability has been established in this matter, each Plaintiff is now entitled to damages in the amounts set forth in annexed Exhibit A and Exhibit B, which reflect the damage amounts previously established and applied by this Court in this and other related cases arising from the terrorists attacks on September 11, 2001 (the "9/11 Attacks") or based upon expert economic reports submitted herewith. In accordance with the terms of the FSIA, the Plaintiffs with liability entered are entitled to compensation under Section 1605A for their solatium, pain and suffering, and economic damages, as applicable, and are also entitled to prejudgment interest. Further, the 9/11 decedent estates are now entitled to compensatory damages for pain and suffering and economic damages, as applicable, as set forth in annexed Exhibit B, which are the same amounts as previously established by the Court in related cases arising from the 9/11 Attacks, and in accordance with the expert economic reports submitted at this time, as annexed to the Goldman Declaration.

### B.    Solatium Damages

As set forth above, the FSIA specifically provides for an award of solatium damages. Under § 1605A, family members of a decedent may recover for "the mental anguish, bereavement, and grief that those with a close relationship to the decedent experience as a result of the decedent's death, as well as the harm caused by the loss of decedent's society and comfort." *Dammarell v. Islamic Republic of Iran*, 281 F. Supp. 2d 105, 196 (D.D.C. 2003),

27

*vacated on other grounds*, 404 F. Supp. 2d 261 (D.D.C. 2005). Other courts have previously noted that "[a]cts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009). In cases brought under this exception to the FSIA, solatium claims have been treated as analogous to claims for the intentional infliction of emotional distress. *See, e.g.*, *Surette v. Islamic Republic of Iran*, 231 F. Supp. 2d 260, 267 n.5 (D.D.C. 2002) (treating solatium claim as "'indistinguishable' from the claim of intentional infliction of emotional distress" (quoting *Wagner v. Islamic Republic of Iran*, 172 F. Supp. 2d 128, 135 n.11 (D.D.C. 2001))).

When previously awarding solatium damages in other cases related to the 9/11 Attacks, such as those noted above, this Court looked at the framework established by District Court Judge Royce C. Lamberth in *Heiser*, 466 F. Supp. 2d at 229, where the court awarded solatium damages to each spouse of a deceased victim in the amount of $8 million, to each parent in the amount of $5 million, and to each sibling in the amount of $2.5 million. *Id.* This formula, however, may be adjusted upward or downward when circumstances warrant. *See*, e.g., *Est. of Bland v. Islamic Republic of Iran*, 831 F. Supp. 2d 150, 156 (D.D.C. 2011); *Valore*, 700 F. Supp. 2d at 85.

Analyzing the solatium claims of the families of the *Havlish* victims who perished in the 9/11 Attacks, Magistrate Judge Maas concluded that an upward departure from Judge Lamberth's framework in *Heiser* was appropriate because the decedents' immediate family members suffered, and continue to suffer "profound agony and grief" and "[w]orse yet, …are faced with frequent reminders of the events of that day." ECF No. 2618 at 10-12. Judge Maas noted in his July 30, 2012 Report and Recommendation the "extraordinarily tragic circumstances

surrounding the September 11th attacks, and their indelible impact on the lives of the victims' families . . ." *Id.* at 11.  In that Report and Recommendation, with which this Court later agreed, Magistrate Judge Maas recommended that solatium damages be awarded to the immediate family members of the victims of the 9/11 Attacks in the following amounts:

| Relationship of Decedent | Solatium Award |
|---|---|
| Spouse | $12,500,000 |
| Parent | $8,500,000 |
| Child | $8,500,000 |
| Sibling | $4,250,000 |

*Id.* at 11.

These exact amounts were adopted by this Court in its October 3, 2012 Order, ECF No. 2623, and were replicated in this Court's June 16, 2016 Order relating to the claims of certain of the *Ashton* Plaintiffs, ECF No. 3300, in the September 12, 2016 Order pertaining to plaintiffs in *Bauer*, ECF No. 3341, in the October 14, 2016 Report and Recommendation, ECF No. 3363, and in the October 31, 2016 Order in *Hoglan*, ECF No. 3384.  These amounts were, again, adopted by this Court in its April 24, 2018 Order relating to the claims of additional *Ashton* plaintiffs, ECF No. 3977 at 6–7.  The same amounts were adopted in the Court's June 8, 2018 (Corrected) Order of Partial Final Default Judgment in the matter known as "*Burnett/Iran II*," No. 15-cv-09903, ECF No. 101.[14]

The solatium losses suffered by the Exhibit A Plaintiffs are legally and factually comparable to those suffered by the plaintiffs in *Havlish*, *Ashton*, *Bauer*, *Hoglan*, *O'Neill*, and

---

[14] The same values were applied to the claims of other plaintiffs in the earlier *Burnett* case in this Court's July 31, 2017 Order, ECF No. 3666, are in other filings of the *Burnett*, *Ashton*, and *O'Neill* plaintiffs.

*Burnett*. As such, Plaintiffs identified in annexed Exhibit A respectfully request that the Court grant awards of solatium to the immediate family members identified in annexed Exhibit A in the same amounts indicated herein, consistent with this Court's application of those values established and applied in *Havlish*, and subsequently adopted and applied to plaintiffs in the *Ashton*, *Bauer*, *Hoglan, O'Neill*, and *Burnett* cases.

###### C.    Estate Pain and Suffering Damages

As noted above, the Plaintiffs identified in annexed Exhibit B are the personal representatives of estates of individuals who were killed in the 9/11 Attacks, some of whom seek compensatory damages for the decedents' pain and suffering. This Court previously assessed the entitlement and value of pain and suffering awards to estates for their decedents' deaths in this litigation. ECF No. 2618 at 7-9.

For the reasons articulated by this Court previously, the relevant estates, as set forth in annexed Exhibit B, respectfully request that the Court grant an award for the decedents' pain and suffering in the amount of Two Million Dollars ($2,000,000). *See id.* at 9; ECF No. 2624 at 1, 3-4 (Judge Daniels awarding $2,000,000 per estate). *See* Goldman Declaration at ¶ 18.

###### D.    Estate Economic Damages

The FSIA specifically provides for economic damages. *See* 28 U.S.C. § 1605A(c). The economic damages provision is "designed to compensate [a] decedent's heirs-at-law for economic losses which result from [the] decedent's premature death." *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 27 (D.D.C. 1998). Accordingly, "the beneficiaries of each decedent's estate [are]…entitled to recover the present value of economic damages, including lost wages that the decedents might reasonably have been expected to earn but for their wrongful deaths." *Valore*, 700 F. Supp. 2d at 81-82 (D.D.C. 2010), citing *Heiser*, 466 F.Supp.2d at 229. Thus, for example, United States District Court Judge Royce C. Lamberth, in a series of decisions issuing

30

final judgments Iran under the FSIA, has held Iran "liable for the economic damages caused to decedents' estates." *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 399-400 (D.D.C. 2015), quoting *Valore*, 700 F.Supp.2d at 78.[15]

Previously, this Court awarded economic damages in prior Iran cases for the "economic losses stemming from the wrongful death of the decedent[.]" *See* ECF No. 2623 at 2-3. In doing so, it adopted the economic loss calculations set forth in the plaintiffs' economic expert reports.

The estates in annexed Exhibit B and as specifically identified and set forth therein, and which provided economic expert reports, transmitted to the Court in the Goldman Declaration, seeks economic damage, similar to the plaintiffs in the prior Iran cases in this Court under the standards set in the District of Columbia cases cited herein. Goldman Declaration at ¶¶ 19-26.

As described at length in the Goldman Declaration, in these cases, plaintiffs retained the services of an expert, John F. Beauzile, who possesses a Master's Degree in Actuarial Science from Columbia University ("Expert"), to evaluate the economic losses resulting from decedents' deaths as a result of the 9/11 Attacks. Goldman Declaration at ¶¶ 22-26.

As described in more detail in the Goldman Declaration, and the Expert's Declaration (which is Exhibit C to the Goldman Declaration), we obtained, generally through a Freedom of Information Act ("FOIA") request, entire September 11th Victim Compensation Fund ("VCF") files for a substantial number of the *O'Neill* plaintiffs.[16] Those files, along with other materials provided by the clients, contained various economic expert reports, VCF applications, VCF work

---

[15] In adopting this estate-accumulations calculation, Judge Lamberth recognized that case law under the FSIA was "develop[ing]…a federal standard" and looked to the law of the District of Columbia, which it concluded was "an appropriate model" to adopt and which calculated economic damages as the loss of accretions to the decedent's estate. *Valore*, 700 F.Supp. 2d at 82.

[16] We are still awaiting receipt of additional files which has adversely become impacted by both "normal" delays in receiving responses to FOIA requests and COVID.

papers and distribution plans, VCF determinations, underlying economic documents, and the like.  Using the methodology and assumptions described in his declaration, relying on earlier expert reports, determinations by the VCF, and other documents, the Expert prepared up-to-date economic loss expert reports, copies of which are deemed appended to the Expert's Declaration (Exhibit C) and are being filed on ECF with access restricted to the Court pursuant to the Court's May 5, 2022 Order, ECF No. 7963, setting forth procedures for filing expert reports ("Expert Report") in support of default judgments.

Based on the foregoing, the Plaintiffs respectfully ask that this Court award economic damages to the estates set forth in annexed Exhibit B in the amount stated therein, as supported by the Expert Report.

### E.    Punitive Damages

Plaintiffs are also entitled to punitive damages under the FSIA. 28 U.S.C. § 1605A(c)(4). In the *Havlish* Report and Recommendation on damages, the magistrate judge explained that a "3.44 ratio 'has been established as the standard ratio applicable to cases arising out of' terrorist attacks."  ECF No. 2618 at 13 (quoting *Est. of Bland v. Islamic Republic of Iran*, 831 F. Supp. 2d 150, 158 (D.D.C. 2011)).  This Court adopted that recommendation and awarded punitive damages on each compensatory damages category at a ratio of 3.44 (punitive) to 1 (compensatory).  ECF No. 2623 at 2.  The Court has applied that ratio to awards for plaintiffs in other related cases.  *See*, e.g., ECF No. 3175 at 3 (Magistrate Judge Maas Report and Recommendation to apply a 3.44 punitive multiplier); ECF No. 3229 at 1 (Judge Daniels adopting in its entirety Judge Maas's Report and Recommendation to apply a 3.44 multiplier); ECF No. 3300 at 1 and Exhibit A (Judge Daniels applying 3.44 punitive multiplier to claims in *Ashton*).

However, in *Hoglan*, another case in the *In re Terrorist Attacks on September 11, 2001* multidistrict litigation, Magistrate Judge Netburn recommended that the plaintiffs' request for punitive damages be denied without prejudice. ECF No. 3363 at 28. Judge Daniels adopted Magistrate Judge Netburn's Report in its entirety, denying without prejudice the plaintiffs' request for punitive damages. ECF No. 3384 at 6.

In light of the Court's decision in related litigation to defer determination of punitive damage issues until a later stage of the litigation, Plaintiffs herein request permission to address the issue of punitive damages at a later date. *See*, e.g., ECF Nos. 3666 (Judge Daniels' Order in *Burnett* authorizing plaintiffs to make an application for punitive damages at a later date consistent with any future rulings of the Court), 10470 (Order declining to set a briefing schedule on how to proceed to assess punitive damages against defaulting defendants).

### F.    Prejudgment Interest

An award of prejudgment interest is within the sound discretion of a trial court and is warranted when plaintiffs are delayed in recovering compensation for non-economic injuries caused by acts of terrorism. *See Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 86 (D.D.C. 2011). This Court awarded the *Havlish* plaintiffs prejudgment interest at a rate of 4.96% on their pain and suffering damages awards, to be calculated from September 11, 2001, until the date of judgment. ECF No. 2618 at 13-14. This Court, recognizing that prejudgment interest was appropriate in cases such as these cases, adopted the magistrate judge's reasoning, finding that an award of prejudgment interest was appropriate and accepting the rate of 4.96%, as proposed by the *Havlish* plaintiffs' expert.

After the *Havlish* award, plaintiffs in *Ashton* and *Bauer* proposed, and the Court agreed, that prejudgment simple interest at the New York State statutory rate of nine percent per annum was appropriate in cases where the injuries arose in New York and the prejudgment interest used

in *Havlish*, 4.96 percent per annum, compounded annually, should be reserved for only those cases where the injuries arose in other states.  *See* ECF Nos. 3229 at 2, 3300 at 1, 3341 at 1.

The Second Circuit has held that New York State's statutory prejudgment interest rate should apply to the damages awarded to World Trade Center complex leaseholders in their litigation against American Airlines and United Airlines brought under the federal Air Transportation Safety and System Stabilization Act ("ATSSSA").  Pub. L. No. 107-42, 115 Stat. 230 (2001) (codified as amended at 49 U.S.C. § 40101); *In re Sept. 11 Litig.*, 802 F.3d 314, 343 (2d Cir. 2015).  In that case, the Second Circuit concluded that a federal cause of action under the ATSSSA must look to state rules concerning prejudgment interest.  *Id.*  Accordingly, the Second Circuit held that New York's statutory prejudgment interest rate of nine percent as opposed to a lower rate crafted under federal law, had to be applied to the plaintiffs' claims related to the 9/11 Attacks.  *Id.*

However, in *Hoglan*, Magistrate Judge Netburn recommended that the 4.96 percent interest rate for prejudgment interest should be applied to all of the solatium claims. ECF No. 3363 at 28-29.  Judge Daniels adopted Magistrate Judge Netburn's *Hoglan* Report in its entirety and applied the interest rate of 4.96 percent per annum, compounded annually to all of the claims.  ECF No. 3384 at 6.  Thereafter, in *Burnett/Iran II*, the Court again awarded prejudgment interest of 4.96 per annum, compounded annually.

In light of the Court's decisions in *Hoglan* and *Burnett*, applying the 4.96 percent rate to prejudgment interest, the Plaintiffs respectfully request that the clerk be directed to award prejudgment interest at the rate of 4.96 percent per annum, compounded annually, running from September 11, 2001, until the date of the judgment.

## V.    Conclusion

For all of the reasons herein, the Goldman Declaration, in the papers previously submitted to this Court in support of damages against Iran in this MDL, and as previously decided by this Court, the Plaintiffs respectfully request that this Honorable Court enter an Order:

(1)    determining that service of process was properly effected upon Iran in accordance with 28 U.S.C. § 1608(a) for sovereign defendants and 28 U.S.C. § 1608(b) for agencies and instrumentalities of sovereign defendants;[17] AND,

(2)    granting the Plaintiffs' motion for entry of default judgment against Iran as to liability[18]; AND,

(3)    awarding the Plaintiffs identified in Exhibit A and Exhibit B damages judgments against Iran in the same amounts previously awarded by this Court to various similarly situated plaintiffs in *Burnett*, *Havlish*, *Ashton*, *Bauer*, *O'Neill*, and other cases; AND,

(10)    awarding solatium damages to those Plaintiffs identified in Exhibit A in the amounts of $12,500,000 per spouse, $8,500,000 per child, and $4,250,000 per sibling, as set forth in annexed Exhibit A; AND,

(11)    awarding the estates of 9/11 decedents, through their personal representatives and on behalf of all survivors and all legally entitled beneficiaries and family members of such 9/11 decedents, as set forth in Exhibit B, compensatory damages

---

[17] This only applies for the plaintiffs in this motion in *Gladys Lopez, et al. v. Islamic Republic of Iran*, No. 1:23-cv-08305 (GBD)(SN).

[18] This only applies for the plaintiffs in this motion in *Gladys Lopez, et al. v. Islamic Republic of Iran*, No. 1:23-cv-08305 (GBD)(SN).

for pain and suffering in the same per estate amount previously awarded by this Court regarding other estates of decedents killed in the September 11th attacks, as set forth in Exhibit B; AND,

(12)    awarding compensatory damages to the Plaintiffs identified in Exhibit B for decedents' pain and suffering in the amount of $2,000,000, as set forth in annexed Exhibit B; AND,

(13)    awarding the estates of 9/11 decedents, through their personal representatives and on behalf of all survivors and all legally entitled beneficiaries and family members of such 9/11 decedents, as identified in Exhibit B, an award of economic damages in the amounts set forth in Exhibit B; AND,

(14)    awarding the Plaintiffs identified in Exhibit A and Exhibit B prejudgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the damages judgment, in the amount of $_____; AND,

(15)    granting the Plaintiffs identified in Exhibit A and Exhibit B permission to seek punitive damages, economic damages, and other appropriate damages, at a later date, to the extent such awards have not previously been addressed; AND,

(16)    granting permission for all other Plaintiffs in these actions not appearing in Exhibit A and Exhibit B to submit applications for damages awards in later stages, to the extent such awards have not previously been addressed; AND,

(17)    granting to the Plaintiffs such other and further relief as this Honorable Court deems just and proper.

36

Dated:    New York, New York          Respectfully submitted,
          November 12, 2024

                                       /s/ Jerry S. Goldman
                                       ANDERSON KILL P.C.
                                       Jerry S. Goldman, Esq.
                                       Bruce E. Strong, Esq.
                                       Alexander Greene, Esq.
                                       1251 Avenue of the Americas
                                       New York, NY 10020
                                       Tel:  (212) 279-1000
                                       Fax: (212) 278-1733
                                       Email:  jgoldman@andersonkill.com
                                               bstrong@andersonkill.com
                                               agreene@andersonkill.com

                                       *Attorneys for Plaintiffs*

docs-100717636.1